Filed 3/5/26  P. v. Pruitt CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>RACHEL NICOLE PRUITT,<br><br>        Defendant and Appellant. | A171956<br><br>(San Mateo County Super. Ct.<br> No. 22-SF-005232-A) |

Rachel Nicole Pruitt appeals from a judgment sentencing her to 25 years in state prison after she pled no contest to two felonies—residential robbery and second degree robbery—and admitted two enhancements for the personal discharge of a firearm and the personal use of a firearm, respectively.  Pruitt now complains that in declining to dismiss the personal discharge enhancement, the court failed to (1) place "significant value" on certain factors in mitigation, specifically her prior trauma, and (2) recognize its discretion to impose a lesser enhancement.  As such, she requests remand for "further sentencing proceedings," so the court can "exercise its informed discretion whether to impose a lesser enhancement."  Discerning no error requiring remand, we affirm.

1

# BACKGROUND[1]

Just after midnight on April 23, 2022, a group of 20 high school students, who had just been dropped off after their prom, were standing outside a Redwood City residence when a "medium-sized," four-door sedan without headlights on drove down the street "slowly," passing the group two separate times. After the second pass, a "tall and lean" Black woman estimated to be 5 feet 6 inches to 5 feet 8 inches tall and wearing a black ski mask, a camouflage jacket, and black clothes exited the car carrying a black gun with an extended magazine and "came running" at the group of teens. Jane Doe, who was 16 years old at the time, started running away, but the woman grabbed the back of Jane's neck and pulled her to the ground. Jane turned as she fell, facing the woman, and landed on her knees with her hands in the air; the woman pointed the gun at Jane's legs, her "quads." After Jane fell, the woman let go of Jane's neck, ran back to her car, and drove away; Jane ran to where her other friends were. Jane had bruising on her neck that lasted "two, three days" but did not suffer other physical injuries.

John Doe, then 17 years old, was running away when he saw the woman "grab[] someone and push[] them to the ground" with one hand, while the other was still holding the gun. John ran down the street and hid behind a parked car. The woman started driving the sedan towards John, so he "move[d] around the [parked] car trying not to be seen, and [he ran] into a driveway that's close by." The sedan stopped; the woman got out of the car holding the gun at waist level and walked toward John. John "assumed [he] was going to get shot." When the woman was about one to two feet away, she

---

[1] The incident details are taken from the testimony given at the May 25, 2022, preliminary examination, during which each victim and multiple investigating officers testified.

commanded, " 'Give me your wallet.' "  John responded, " 'Yes, ma'am' " and handed over his wallet, which contained "40 to $60, driver's license, debit card, a gift card," and a "CPR certification card."  The woman then said, " 'Give me your keys,' " to which John responded, " 'I didn't drive.  I don't have keys.' "  The woman directed, " 'Give me what's in your hand,' " and John handed her stickers from In-N-Out Burger.[2]  Then the woman turned around, ran to her car, and drove away.

A little later that same night, police responded to an armed robbery in Foster City where a gun had been fired.  Barnaby Lee was driving home when he noticed a vehicle "on our street facing outward with the headlights on that I thought was a little weird."  As Lee was reversing his car into his garage, he noticed that the vehicle moved to park right in front of his garage.  Lee put his car in park and closed the garage door with his car engine still on, but, as the door was closing, someone "wearing a ski mask and holding a firearm" crawled underneath, causing the garage door to re-open.  It was a woman with "dark skin," "semi-thin figure, average height," who was wearing a ski mask, sweatpants, and a hoodie with "Army camo print" on it.  Lee started honking "out of fear" and "creating noise."  But the woman approached the driver's side window, "pointed a gun at [Lee]," and tried to open the car door.  The barrel of the gun was "on the glass of my driver window, pointed at [Lee]."  It was a dark gray handgun, "a Glock of some kind because of the rectangular barrel shape that Glocks kind of have," and had an extended magazine.

---

[2] The bus driving the high school students had stopped at In-N-Out Burger between leaving the prom and dropping off students outside the Redwood City residence.

The woman "tried to yank the door open," but Lee had locked it.  When the woman said, " 'Open the door,' " Lee responded, " 'I don't have anything for you.' "  While pointing the gun at Lee, the woman warned, " 'Open the door or I'm going to shoot you.' "  Lee was scared and "fearful for [his] life" and clicked the garage door remote to close the door and "to kind of create a distraction."  But the woman walked to the garage door, "pushed it up with her hand," and then came back to the car.  Still pointing the gun through the window, she yelled, " 'Open the F-ing door.' "  Lee again told her, " 'I don't have anything for you' " and tried to close the garage door "to distract her."  The woman went back to the garage door but "didn't fight the door up.  She just kind of stuck her foot in the sensor area, and the garage door went back up . . . ."  The woman returned to the driver's side window and "started to slam the gun onto the window, trying to break it by force."  Lee thought, "this might be it" and sat back in his seat, looking straight ahead.  After five or seven slams on the window, Lee heard the gunshot go off and screamed.  The window broke, leaving shattered glass on Lee's lap; the woman demanded, " 'Give me your wallet.' "  Lee passed his wallet through the hole now in the window, and the woman left.  The wallet contained "about $140 in cash, two debit cards, four credit cards, [his] driver's license, AAA card, [and a] Kaiser card."

The next morning Lee saw that his debit card had been used at a Chevron gas station in Millbrae on East Millbrae Avenue.  Surveillance video from the gas station taken at 12:54 a.m. on April 23 showed a gray-colored Infiniti with no front license plate pull into the gas station.  A woman, whom Lee later identified as the shooter, can be seen pumping gas and reattaching a license plate to the rear of the car.  Images from the video showed the last four digits of the license plate to be G773 or G778.  Comparing this

4

information to automated license plate reader data, investigating police officers were able to see a full plate reading 8UNG778 at the intersection of Millbrae Avenue and Rollins Road, directly in front of the Chevron gas station, at 1:10 a.m. A subsequent records check showed the license plate was registered to Pruitt.

On April 27, 2022, officers conducted a search of Pruitt's residence. A four-door gray Infiniti with the license plate 8UNG778 was parked in front, and Pruitt was present.[3] In the room identified by Pruitt's sisters as her bedroom, officers located "a black Glock, Model G26 semiautomatic handgun, chambered in 9mm." A 30-round magazine was inserted in the gun, and an expelled casing was still in the chamber. Officers also located blue and purple disposable gloves, black leather gloves, a black ski mask, and credit and debit cards bearing the name of Barnaby Lee.

Pruitt was arrested and ultimately charged on June 7, 2022, by criminal information with eight felony counts and multiple enhancements for being armed with, the personal use of, and the intentional discharge of a firearm, as well as one count of misdemeanor battery.[4]

---

[3] Pursuant to a search warrant issued for her vehicle and residence, Pruitt had been the subject of a traffic enforcement stop down the street from her home.

[4] Counts 1 through 6 concerned Lee: (1) first degree residential robbery (Pen. Code, § 212.5) (further undesignated statutory references are to the Penal Code); (2) shooting at an occupied motor vehicle (§ 246); (3) first degree burglary (§ 460, subd. (a)); (4) criminal threats (§ 422, subd. (a)); (5) assault with a semi-automatic firearm (§ 245, subd. (b)); (6) identity theft (§ 530.5, subd. (a)). Counts 7 and 8 concerned John Doe: (7) second degree robbery (§ 212.5, subd. (c)); (8) assault with a semi-automatic firearm (§ 245, subd. (b)). Count 9 concerned Jane Doe: misdemeanor battery (§ 242).

5

On May 15, 2024,[5] Pruitt entered into a negotiated disposition through which she pled no contest to two felonies and admitted their associated enhancements: first degree residential robbery (§ 212.5, subd. (a); count 1, concerning Lee), as a serious felony (§ 1192.7, subd. (c)), with a prior felony conviction (§ 667.5, subd. (c)), and with the personal and intentional discharge of a firearm (§ 12022.53, subd. (c)); and second degree robbery by force or fear (§ 212.5, subd. (c); count 7, concerning John), as a serious felony (§ 1192.7, subd. (c)), with a prior felony conviction (§ 667.5, subd. (c)), and with the use of a firearm (§ 12022.5, subd. (a)). Although Pruitt acknowledged the maximum related sentence could be 41 years in prison, the plea agreement contemplated a sentence no greater than 25 years in prison and included a referral to the probation department for a presentencing report and their recommendation. Pruitt entered into *Arbuckle*[6] and *Harvey*[7] waivers.

---

[5] On July 26, 2022, criminal proceedings were suspended after defense counsel expressed a doubt as to Pruitt's competency. (§ 1368 et seq.) Criminal proceedings were reinstated on February 21, 2023, after consideration of a report in which the evaluator "concluded [Pruitt] was competent to stand trial" and had been " 'malingering, i.e., faking mental illness.' " After multiple pretrial hearings, on December 18, 2023, Pruitt was referred to Mental Health Diversion (MHD). A contested hearing was held on April 8, 2024, after which, Pruitt was deemed "not eligible or suitable for MHD and her application was denied." Because these rulings are not at issue on appeal, we do not discuss them further.

[6] *People v. Arbuckle* (1978) 22 Cal.3d 749, 757 (defendants are "entitled to be sentenced" by the judge who accepts their plea or alternatively "should be permitted to withdraw [their] plea").

[7] *People v. Harvey* (1979) 25 Cal.3d 754 (facts underlying charges dismissed as part of a negotiated plea may not, absent contrary agreement by the defendant, be considered adversely in sentencing).

In its June 17, 2024 presentencing report, the probation department recommended that probation be denied and that Pruitt, "who poses a serious threat to others if she is not imprisoned," be committed to the Department of Corrections and Rehabilitation. The report attached victim impact statements detailing that this encounter had been "the most traumatic experience of [Lee's] life" which not only affected him "but the life of his family as well"; John Doe "lost a significant amount of weight and suffered from anxiety, panic attacks, and loss of appetite"; and Jane Doe had to end her employment and was unable to attend school on a regular basis "due to on-going mental health struggles."

The confidential presentencing report also summarized Pruitt's interview with the probation department, in which she detailed "a very traumatic childhood" that included sexual assault and exploitation, domestic violence, and continuous drug and alcohol use. However, the probation department noted some inconsistencies in Pruitt's statements. For example, Pruitt reported she "did not have a childhood involving any of her family members" and "has been on her own since the age of 8" but also reported she "speaks to her biological mother and father regularly and has a close relationship with them." Pruitt represented that she "will be transient upon her release from custody, as she has not resided with her family since the age of 8," but her statement included in the "corresponding police report" from the incident states that Pruitt "has resided with her family for many years," unless she stays with friends.

The probation department commented that Pruitt "did not take any accountability for committing the present offenses." Pruitt had stated that she was "extremely high on drugs" at the time of the incidents and believed she was witnessing a kidnapping; she "never intended to hurt anyone" and

only wanted "to help this young girl because I thought she was in a bad situation. I want to apologize because now that I am sober, I understand that's not what was going on."

The sentencing hearing took place over multiple dates to enable Pruitt's submission of "a social work study." On July 10, 2024, the named victims and their families offered their impact statements. The district attorney cited Pruitt's "feigning symptoms of mental illness" that "delayed the case significantly" and her statement to the probation department "attempting to avoid taking accountability" and "fail[ing] to show remorse" and asked the court to consider Pruitt's "ongoing attempts to avoid taking responsibility for her conduct" and impose a sentence of 25 years in state prison. On September 11, 2024, a different district attorney made the same sentencing request, asserting that Pruitt "has taken no responsibility" and "everything included in the defense memo was from 2023"; it did not include anything "from this year that was recent." The district attorney disagreed with the defense characterization that "the crimes were a result of the defendant's mental state at the time" and "if treated" were "unlikely to reoccur" and instead argued Pruitt was "trying to play the system."

Pruitt's attorney referenced an apology letter her client read to the court to show Pruitt was "taking responsibility"; she referred to Pruitt's childhood trauma, emphasizing that Pruitt "herself is a victim" but "managed to get through all of that with no criminal history" and now has the support of her biological father. Defense counsel provided the court with a "2017 PTSD diagnosis from having battered women's syndrome from her long-term, very abusive, very sexually-exploitative relationship" and asserted that Pruitt was not "playing the system," instead, "she has been manipulated. She has not been taken seriously as a human being and a victim herself."

8

Pruitt requested probation and a referral to a drug treatment program and offered to waive her existing custody credits and "do a 90-day diagnostic" in order to "give her a chance that she deserves to make sure this never happens again."

Before sentencing Pruitt, the court commented, "this is probably one of the most unique cases I have seen on the bench," and characterized Pruitt as "a victim of other people and their behavior towards her." The court took "into consideration" the mental health reports that suggested "a false persona and devious behavior" but said "there is truth" to Pruitt's "self-described background." The court considered "the facts of this case, the impact on the victims" and noted there are "times we have to protect the public by putting someone in custody. . . . [¶] . . . . There is a bright line with some conduct that I just can't overlook as a Judge." The court represented it had reviewed the probation report and counsels' sentencing memoranda, was taking "into account [Pruitt's] situation," and stated, "what you said happened to you as a child, it is absolutely devastating." The sentencing court then denied Pruitt's request for probation and imposed a state prison term for a total of 25 years, comprised of the midterm of four years on count 1, first degree residential robbery, with 20 years consecutive for the intentional discharge of a firearm (§ 12022.53, subd. (c)), and one-third of the midterm for count 7, second degree robbery, for 1 year consecutive. The court struck the personal use enhancement associated with count 7 "for punishment only" (§ 12022.5, subd. (a).)

Pruitt timely appeals.

## DISCUSSION

On appeal, Pruitt challenges the imposed sentence, arguing the court "failed to determine [Pruitt's] motion to dismiss" the enhancement for the

9

intentional discharge of a firearm under section 1385, subdivision (c). Pruitt further contends the court failed to exercise its discretion to impose a lesser enhancement under section 12022.53. In view of these asserted errors, Pruitt seeks remand to enable the court to exercise "its informed discretion" whether to dismiss the firearm enhancement or impose a lesser enhancement.[8] We discern no error and therefore decline to remand.

## I. *Enhancement for the Intentional Discharge of a Firearm*

" 'A judgment or order of the lower court is *presumed correct* . . . and error must be affirmatively shown.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) This general rule applies with equal force to sentencing decisions. (See *People v. Carmony* (2004) 33 Cal.4th 367, 378.) In the absence of an affirmative showing of error, " ' "the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' " (*Id.* at pp. 376–377.) A trial court's decision to impose a particular sentence is reviewed for abuse of discretion and "will not be disturbed on appeal absent a showing that the court acted in an arbitrary, capricious, or patently absurd way, resulting in a manifest miscarriage of justice." (*People v. Blackwell* (2016) 3 Cal.App.5th 166, 199.) "[A] trial court

---

[8] The Attorney General contends that by failing to "invite the court to dismiss enhancements under section 1385" and instead focusing on a request for probation under California Rules of Court, rule 4.414 (further rules references are to the California Rules of Court), Pruitt has forfeited her claims on appeal. While the Attorney General's point is well-taken and certainly influences the verbiage used by the court at sentencing, because Pruitt did cite section 1385, subdivision (c) in her presentencing memorandum, we exercise our discretion to consider the merits of her appeal. (*People v. McCullough* (2013) 56 Cal.4th 589, 593 ["neither forfeiture nor application of the forfeiture rule is automatic," and appellate courts have discretion to review otherwise forfeited challenges].)

does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Carmony*, at p. 377.)

Section 1385, subdivision (c)(1), as amended by Senate Bill No. 81 (2021–2022 Reg. Sess.) provides, "the court shall dismiss an enhancement if it is the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute." Section 1385, subdivision (c)(2) further provides the court "shall consider and afford great weight to evidence" offered by a defendant prove the presence of circumstances in mitigation. Proof of these circumstances "weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." (§ 1385, subd. (c)(2).) To "endanger public safety" means there is "a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others." (*Ibid*.) However, even absent a finding that dismissing an enhancement would endanger public safety, "a court retains the discretion to impose or dismiss enhancements provided that it assigns significant value to the enumerated mitigating circumstances when they are present." (*People v. Walker* (2024) 16 Cal.5th 1024, 1029.)

Pruitt now claims the court "failed to assign significant value" to the impact of the admitted enhancement upon her sentence and "failed to find that dismissal of the enhancement would pose a danger to public safety," thus, remand is required. She further faults the court for "never [making] a determination whether or not the current offense was connected to [her] background" and for not placing "significant weight" upon this factor. Instead, the court "simply weighed this factor in determining whether to grant probation or impose a prison sentence."

11

The mitigating circumstances applicable here include the fact that, if imposed, the section 12022.53, subdivision (c) enhancement for discharge of a firearm would result in a sentence of over 20 years (§ 1385, subd. (c)(2)(C)) and may include a connection to mental illness (*id*., subd. (c)(2)(D)) and prior victimization or childhood trauma. (*Id*., subd. (c)(2)(E); rule 4.423(b)(3).)

To start, we do not fault the trial court for not uttering the specific words Pruitt seeks on appeal, as Pruitt did not object to or seek clarification of the trial court's findings at sentencing. (*People v. Scott* (1994) 9 Cal.4th 331, 356 ["complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal"].) Moreover, "Unless the record affirmatively demonstrates otherwise, the trial court is deemed to have considered all the relevant sentencing factors set forth in the rules." (*People v. Parra Martinez* (2022) 78 Cal.App.5th 317, 322; see *People v. Carmony*, *supra*, 33 Cal.4th at pp. 376–377; rule 4.409 [all relevant sentencing factors "will be deemed to have been considered unless the record affirmatively reflects otherwise"].)

Even absent Pruitt's objection before the trial court, the record is replete with references to the court's appropriate consideration of the factors in mitigation before imposing the enhancement. First, all parties and court recognized and discussed the impact of the imposition of the section 12022.53, subdivision (c) firearm discharge enhancement. It formed the basis of the 25-year maximum prison sentence calculation—in lieu of 41 years—negotiated by counsel that Pruitt acknowledged and consented to in executing her plea waiver form and entering into the plea agreement. The length of the enhancement and Pruitt's danger to others is the subject of the probation department's presentencing report, which opines, "The defendant has

12

demonstrated that she is a violent individual, who poses a serious threat to others if she is not imprisoned; thus, it is recommended that she be committed to the Department of Corrections and Rehabilitation." The district attorney's sentencing memorandum similarly posits that the conduct in this case "establishes that [Pruitt] is a serious danger to society if she is to be released." Pruitt's counsel's sentencing memorandum acknowledges Pruitt was armed, "was an active participant," acted in a "surprisingly violent manner," and used a firearm that was "loaded and operable." Defense counsel points out, "The application of an enhancement in this case could result in sentence over 20 years" and "A 25-year sentence would affect Ms. Pruitt's ability to ever have children of her own."

After both counsel expounded on their positions in argument, the court expressly stated it reviewed the sentencing materials and their attachments. The court explained, "We had guns involved. We had guns going off with somebody trapped in a car, and children just trying to go to a -- and they are children. You may not think they are, but they are children. And they are going to their prom, and they have guns pointed at them. I cannot overlook that." The court continued, "there [are] times we have to protect the public by putting someone in custody" and concluded, "I can't justify to a community taking a risk." The court then denied the request for probation and imposed the contemplated 20-year enhancement. Considering the materials submitted to the court, these statements were sufficient to demonstrate the sentencing court's decision to impose the firearm discharge enhancement while recognizing its length, because dismissal of the enhancement would "endanger public safety." (§ 1385, subd. (c)(2).)

Second, the record similarly demonstrates that the court both "made a determination" that the instant offense was connected to Pruitt's traumatic

13

background and placed "significant weight" on that factor in mitigation. The September 11 sentencing hearing contains repeat comments from the court acknowledging the trauma Pruitt suffered as a child through the present day and connecting that trauma to the convicted offenses. For example, after the district attorney complained of Pruitt's malingering, the court interjected, "There must have been something drug induced or something for this behavior obviously. Such a random act. Such a dangerous act." After hearing the arguments of counsel, the court complained, "this case just tears at me," "if anyone would have read [Pruitt's self-described background], she is a victim." The court compared the anxiety suffered by the robbery victims here "especially a 17 year old" to the "trauma" that Pruitt herself had suffered: "Hopefully, they are getting the same treatment that I wish somebody afforded you to overcome the trauma." The court considered the mental health expert's conclusions that Pruitt presented "a false persona and devious behavior" but went on to say, "However, I do think your self-described background, a large part of it, I'm sure there is truth to that." The court continued, "I do take into account your situation" and referenced what "happened to you as a child, it is absolutely devastating."

Such a record sufficiently demonstrates that the court acknowledged Pruitt's childhood trauma as a factor in mitigation, determined it was connected to the commission of these "extremely violent incident[s]" even though Pruitt, then 35 years old, had "basically no record," and gave it significant weight as a factor in mitigation. Only then did the court conclude, "you crossed that line"; thus, to "protect the public" an extended prison sentence was warranted. Accordingly, we conclude the trial court did not abuse its discretion in imposing the firearm enhancement under section 12022.53, subdivision (c).

14

## II. *A Lesser Enhancement Under Section 12022.53*

In *People v. Tirado* (2022) 12 Cal.5th 688, 692, our Supreme Court held that a court may strike a section 12022.53, subdivision (d) enhancement found to be true and instead impose a lesser uncharged enhancement within the statutory framework of section 12022.53.[9]  Pruitt argues for the first time on appeal "Because the record does not reflect whether the court considered replacing the section 12022.53, subdivision (c) enhancement with a lesser term under subdivision (b), appellant's sentence should be remanded for the trial court to exercise its informed discretion whether to impose a lesser enhancement."  Pruitt argues that the court's imposition of a 25-year sentence after stating the case "just tears at me" is "inexplicable" and must mean the court was not aware of its discretion to impose an alternative, lesser enhancement.  We are not persuaded.

As "a general rule ' "a trial court is presumed to have been aware of and followed the applicable law" ' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 398, as modified on denial of rehg., Oct. 1, 2014), and a silent record does not demonstrate error (*People v. Czirban* (2021) 67 Cal.App.5th 1073, 1097 [" 'remand is unnecessary if the record is silent concerning whether the trial court misunderstood its sentencing discretion.  Error may not be presumed from a silent record' "]; see, e.g., *People v. Coleman* (2024) 98 Cal.App.5th 709, 724 ["Defendant has not affirmatively demonstrated that the trial court was unaware of or misunderstood the scope of its sentencing

_____

[9] Section 12022.53 provides that a person who personally uses a firearm shall be punished by an additional consecutive term of imprisonment for 10 years, while a person who personally and intentionally discharges a firearm shall be imprisoned for 20 years, and a person who personally and intentionally discharges a firearm during the commission of a specified felony shall be imprisoned for an additional consecutive term of imprisonment of 25 years to life.  (§ 12022.53, subds. (b), (c) & (d).)

discretion"].) As such and without more, Pruitt's citation to a silent record does not demonstrate the court failed to exercise its discretion to impose a lesser sentencing enhancement within section 12022.53. (See *Czirban*, at p. 1097.)

Moreover, the court's statements in the record demonstrate a knowing exercise of discretion in its decision to impose the 25-year sentence it did. For example, after the district attorney's initial argument at sentencing, the court inquired, "in the People's papers, it says to stay the 12022.5. But I think I strike it, correct, for punishment only?" This question, though related to count 2's stricken use enhancement not challenged or otherwise discussed on appeal, suggests a court knowledgeable of current sentencing laws, including the distinction between striking and staying an enhancement. (*People v. Tirado*, *supra*, 12 Cal.5th at p. 700 [when the trier of fact finds "true the facts supporting a section 12022.53(d) enhancement, and the court determines that the section 12022.53(d) enhancement should be struck or dismissed under section 12022.53(h), the court may, under section 12022.53(j), impose an enhancement under section 12022.53(b) or (c)"]; *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1390 ["Absent evidence to the contrary, we presume that the trial court knew and applied the governing law"].) In addition, the court's extended analysis discussed above, balancing the trauma suffered by Pruitt with the seriousness of the offenses and her continuing dangerousness and ultimately deciding to impose a 25-year prison commitment, shows that, even if unaware of its ability to impose a lesser enhancement, the court did not think a lesser enhancement would be appropriate. (*People v. Salazar* (2023) 15 Cal.5th 416, 424 [" 'the appropriate remedy is to remand for resentencing unless the record "clearly indicate[s]" that the trial court would have reached the same conclusion "even if it had

been aware that it had such discretion" ' "].)  As such, we discern no error requiring remand.

## DISPOSITION

The judgment is affirmed.

DESAUTELS, J.

We concur:

STEWART, P. J.

MILLER, J.

*People v. Pruitt* (A171956)